**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
12/03/2015

| | | |
|---|---|---|
| IN RE: | § | |
| KIM RANDALL ENLOE | § | CASE NO: 14-36358 |
| Debtor(s) | § | |
| | § | CHAPTER  7 |

## MEMORANDUM OPINION

Sharron and Stepehn Waszkiewicz (collectively, "the Waszkiewiczes") have filed an objection to Debtor Kim Enloe's claimed homestead exemption of $155,600.00 pursuant to 11 U.S.C. § 522(o).  Enloe transferred $195,000.00 of non-exempt assets into his homestead with the intent to hinder, delay, or defraud creditors.  He also invested $110,000.00 of exempt assets into his homestead.  Accordingly, his homestead exemption must be reduced to 36.1% of the proceeds from the sale of his home up to the $155,675.00 limit set by 11 U.S.C. § 522(p).

### Background

*Procedural Posture*

Kim Enloe filed for chapter 7 protection on November 14, 2014.  (ECF No. 1).  In his schedules he identified Sharron and Stephen Waszkiewicz as his largest creditors with an unsecured claim totaling $100,868.13.  *Id.*  On June 11, 2010, the Waszkiewiczes obtained a final judgment against Enloe in Cause No. 2009-07070 in the 80th Judicial District, Harris County, Texas.  (Movants' Ex. No. 1).  The state court ordered Enloe to pay $68,032.21 in damages, an additional $27,850.00 in attorney's fees, and $4,985.92 in pre-judgment interest.  *Id.*  On August 13, 2010, the Waszkiewiczes recorded an Abstract of Judgment against Enloe's property at 6233 Queeswood (*sic*) Lane, Houston, TX 77008.  (Movants' Ex. No. 2).

In his bankruptcy schedules, Enloe claimed a homestead exemption for property located at 3506 Griggs, Houston, TX 77021 in the amount of $184,516.00.[1]  (ECF No. 1 at 12).  Enloe further claimed an exemption for a $150,000.00 Beneficiary IRA held by Raymond James.  *Id.*  The Waszkiewiczes filed an objection to both claimed exemptions on February 9, 2015.  (ECF No. 15).  Enloe responded on March 2, 2015.  (ECF No. 21).  At a hearing on May 14, 2015, the Court ruled that the Raymond James IRA was properly claimed as exempt pursuant to Tex. Prop. Code § 42.0021(a).  The Waskiewiczes then proceeded with their case.

Enloe testified at the May 14 hearing.  During his testimony, Enloe began to have difficulty coherently answering questions, and the Court continued the hearing.  The hearing resumed on July 22, 2015.  Enloe testified that he had recently struggled with alcohol abuse and could not remember his testimony at the last hearing.  Enloe further testified that his decisions regarding the Griggs Road home were made while he was severely impaired due to his alcoholism.  The Court requested briefing on the issue of alcohol impairment as it relates to the intent to hinder, delay, or defraud creditors.  After hearing closing arguments on September 28, 2015, the Court took the matter under advisement.

*The Griggs Road Property*

Enloe's father died on February 17, 2012.  (Movants' Ex. No. 15).  His father owned a townhome in Houston, a Raymond James IRA, and some additional cash in a Raymond James annuity.  (ECF No. 65 at 7) (testimony of Enloe).  As the administrator of his father's estate, Enloe signed a Notice of Purchase for the townhome on August 30, 2012.  (Movants' Ex. No. 13).  The sale generated approximately $50,000.00 in proceeds which were placed into the probate estate.  (ECF No. 65 at 7, 10).  Enloe testified that he personally received approximately

---

[1] Enloe filed amended schedules on September 27, 2015, reducing the value of his claimed homestead exemption to $155,600.00.  (ECF No. 82).

$35,000.00 in cash from the sale of the townhome.[2]  *Id.* at 11.  Enloe also received $116,000.00 in cash from the Raymond James annuity in March of 2012.  *Id.* at 16.  Finally, the Raymond James IRA held approximately $300,000.00 at the time of his father's death.  *Id.*  By November of 2014, when Enloe prepared his bankruptcy schedules, that value had diminished to $150,000.00.  (Movants' Ex. No. 9) (Bankruptcy Schedule C).

On July 27, 2012, Enloe purchased the property located at 3506 Griggs Road, Houston, TX for $70,000.00.  (Movants' Ex. No. 12; ECF No. 65 at 19).  When asked where he received the funds used to purchase the property, Enloe testified that it came from his father's inheritance, specifically "[t]he funds [that] were held at Raymond James."  (ECF No. 65 at 20).  Counsel for the Waszkiewiczes then asked:

> Q: Was the seventy thousand dollars out of the cash you received from Raymond James?
>
> A: Yes.
>
> Q:  Was any part of that seventy thousand dollars out of any distributions from the inherited IRA that was held by Raymond James?
>
> A: No.

*Id.*

Enloe, who has been in the general construction business for 27 years, testified that he generally understood that Texas homestead law made homes exempt from the bankruptcy process.  *Id.*  He testified further that he was surprised to learn at his § 341 creditors' meeting

---

[2] Although Enloe originally provided ambiguous answers regarding the proceeds from the townhome, he eventually conceded the point.

> Q: Have we established, Mr. Enloe, that out of the fifty thousand dollars that was realized through the sale of your father's townhome on Beverly Village that you received somewhere in the neighborhood of thirty-five thousand dollars?
>
> A: Yes.  (ECF No. 65 at 15).

that 11 U.S.C § 522(p) limits the homestead exemption for property acquired within the 1215-day period preceding the bankruptcy filing.  *Id.* at 22.  The following exchange then occurred:

> Q: But did you go into the bankruptcy filing in November of 2014 under the belief that the entirety up to whatever value at 3506 Griggs Road may have would be [*sic*] protected from your creditors?
>
> A: That is my general understanding of homestead.  I designed and built the house to live there indefinitely.  And so, that's the path I took.  It's my third house.  And – so, this one was for me.  I have lost two houses to two wives.
> . . .
> Q: Okay.  Maybe I – let me maybe be more clearer [*sic*].  I believe you in describing 3506 Griggs and the residence that you have constructed on that piece of property that you stated that it does not belong [to your ex-wives].  Did I mishear you perhaps?
>
> A: Yeah.
>
> Q: Or is that what you said?
>
> A: I think you did.  This was done to set my daughter up in life.
>
> Q: The construction of 3506 was designed to set your daughter up for life; is that what you just testified to?
>
> A: Exactly. . . .  It was to forward the corpus into her future.
>
> Q: And so that was undertaken in an effort to prevent your creditors from being able to get assets that you had through the construction and residence of 3506 Griggs Road; is that right?
>
> A: No.  I always knew I would be paying these guys off.
> . . .
> Q: And prior to the filing of your bankruptcy, was your goal in building and buying – and building a residence at 3506 Griggs Road to protect your assets from your creditors so that they would be preserved for your daughter?
>
> A: Yes.  However, may I just comment for a moment?  Had I understood the real nature of bankruptcy law in America I never would have filed; I would dealt [*sic*] all this out by designing and building a house and paying everybody off.  I never would have done this.
>
> Q: But you didn't do that; did you?
>
> A: Well, it takes a moment, you know Mr. Johnson. . . .

*Id.* at 24-25.

Enloe began construction on his home at the Griggs Road property in October of 2012. *Id.* at 30. As the project manager, he was responsible for hiring all contractors who performed construction work on the house. *Id.* Enloe estimated that he spent approximately $100,000.00 from the cash portion of his father's estate as well as portions of proceeds from the IRA to construct the house in 2012. *Id.* at 33. In 2013, he estimated that he spent an additional $110,000.00 on construction, the majority of which came from the IRA. *Id.* at 42-43.[3] By this point, the cash in the Raymond James annuity was almost depleted. Account records from Raymond James indicate that Enloe withdrew a total of $247,420.05 from the annuity in 2012. (Movants' Ex. No. 18).

Just prior to the commencement of construction, Enloe had set up a company called Usonian, LLC as "an umbrella or label that I used for building [homes]." (ECF No. 80 at 34) (testimony of Enloe). Usonian registered with the Texas Secretary of State on September 12, 2012. (Movants' Ex. No. 27). Although he had ostensibly set up Usonian to develop several homes, Enloe acknowledged that Usonian built no houses other than the Griggs Road house. (ECF No. 80 at 38). He testified that money deposited with Usonian was used on the Griggs Road home. *Id.* at 39. On September 20, 2012, Enloe deposited $100,000.00 into Usonian's account, also with Raymond James. (Movants' Ex. No. 19 at 3). An additional $25,000.00 was deposited on December 17, 2012. *Id.* Notably, the Raymond James annuity showed matching withdrawals of $100,000.00 and $25,000.00 on September 20, 2012, and December 17, 2012, respectively. (Movants' Ex. No. 18 at 4).

---

[3] Q: And of the hundred and ten thousand dollars that you took of the distribution from the IRA in 2013, how much of that did you expend on the construction of 3506 Griggs Road?

A: Almost all of it for sure. (ECF No. 65 at 42).

In 2012, Usonian possessed no other funds in its account with Raymond James other than the $125,000.00 transferred from the annuity.  (Movants' Ex. No. 19 at 2).  Beginning on October 10, 2012, Enloe began writing a series of checks drawing on the Usonian account.  *Id.* at 3-5.  He wrote a total of 120 checks equaling $116,216.22.  *Id.* at 5.  As discussed above, according to Enloe's testimony these payments went towards the construction of the Griggs Road property.

By December of 2014 the electrical work on the house was complete.  (ECF No. 80 at 46).  Enloe acknowledged that completion of the electrical work generally indicates that a house is finished but contended that the Griggs Road house had not been completed.  *Id.*  He testified that his severe drinking caused him to make numerous errors during construction due to his lack of communication with subcontractors and mistakes in judgment.  *Id.* at 53.  The house lacks completed flooring and kitchen counters and was not painted properly, resulting in siding which peels away from the walls.  *Id.* at 55.  Enloe's friend Kaitlyn Sharp also testified to the condition of the house in June of 2015:

Q: What condition was the house in once you got inside?

A: Well, once outside, the siding was falling off the house.  The brick wasn't finished.  There were holes; you could see there were cracks.  The front door had water marks about two feet, I think, up the front door.  I was really pretty shocked at the condition of a house done by Kim.

And when I got inside, the downstairs there's a bathroom that wasn't finished and a – there's a laundry room that wasn't finished, an office which looked relatively finished. . . . When I got inside, there was paint on the floors.  The bathroom – the master bathroom was torn apart.  The kitchen was a mess.

(ECF No. 80 at 74).  Nevertheless, photographs of the house taken in early 2015 demonstrate that, while the construction may have been shoddy, the house is functionally complete, furnished, and generally livable.  (Movants' Ex. No. 17).

*Enloe's Alcohol Abuse*

Enloe has blamed a drinking problem he developed after the death of his father for the dilapidated condition of the house as well as his alleged memory problems.  According to Enloe, he started out drinking in small amounts but eventually built up to more than a fifth of liquor per day.  (ECF No. 80 at 53).   His drinking developed to the point that, by late 2014, he was hospitalized from September 24 to October 3 and then again in November.  *Id.* at 60-61.  He was also hospitalized three times in 2015.  Enloe testified at the July 22, 2015, hearing that he was not sober during his previous testimony at the May 14, 2015, hearing.  *Id.* at 62.  Shortly after the May 14 hearing he suffered a severe alcoholic breakdown and was persuaded by friends and family to check into a VA hospital.  (ECF No. 80 at 75) (testimony of Kaitlyn Sharp).  Enloe was in the VA hospital from approximately June 4, 2015 to July 10, 2015.  *Id.*   According to his testimony, he has been sober since.  *Id.* at 62.

When asked to describe the effect of his drinking, Enloe testified as follows:

Q: Did this have an effect on your mental state?

A: Propound [*sic*] effect.

Q: What kind of an effect?

A: Loss of memory, loss of judgment, loss of mental acumen

Q: Can you . . . explain what happened with regard to the building of your home?

A: I did not exhibit my natural . . . capacity in attention and detail.  I didn't notice mistakes going into the house, major structural mistakes.  And I did not attain the finish normal to my capacity for design – custom designed homes.  I just dropped the ball in so many ways, just obliterated my judgment and capacity to communicate with the subcontractors and to guide and correct, you know, errors on the job. . . .  I was so – I don't want to say out of it, but I was so impaired, and I did not keep up with receipts of records very well.

*Id.* at 53-54.

Two witnesses corroborated Enloe's alcohol abuse.  Kelly Blakley had been Enloe's friend since 2001.  *Id.* at 64 (testimony of Kelly Blakley).  She noticed that he began drinking more and more at barbecues they attended with friends and that the drinking became particularly pronounced in recent years.  *Id.*  His drinking affected his memory generally, for example causing him to forget upcoming dinner dates.  *Id.*  In September of 2014 she insisted that he check himself into the hospital after she picked him up from work disoriented and standing in the middle of the street.  *Id.* at 66.  She was also instrumental in convincing him to go to the hospital again in June of 2015.  Kaitlyn Sharp, another friend, testified that Enloe's behavior had begun to change in recent years and that he started slurring words and had difficulty remembering conversations.  *Id.* at 72.

At the July 22 hearing, Enloe blamed his alcoholism for an apparent misstatement with regards to his intent in constructing the Griggs Road house.  When asked directly whether he built the house to set up a nest egg for his daughter, he stated "[n]o.  I did not."  *Id.* at 27.  Although he admitted that he testified to the opposite effect at the May 14 hearing, he stated he could not remember doing so and that it was an incorrect statement.  *Id.* at 28.  Attempting to clarify the discrepancy, Enloe stated:

> Well, you do one and then another.  So, it wasn't that it would set her up in life, one house.  Well, it wouldn't – see, it would – I mis – if I misspoke – I don't remember the testimony exactly very well, and so, it had always been my call to set her up in life but had no intent or idea it would happen with just one house.  I would have to go on. . . .  [I]t may have been part of trying to set her up for life. . . .

*Id.* at 30.

### Analysis

On the date a case is commenced under the Bankruptcy Code, an estate is created consisting of all assets listed in the debtor's schedules.  11 U.S.C. § 541(a).  The Code also

provides that a debtor may exempt certain property from the bankruptcy estate.  *Id.* § 522.  A party objecting to an exemption in bankruptcy has the burden of proving by a preponderance of the evidence that the exemption is improper.  Fed. R. Bankr. P. 4003(c).

*11 U.S.C. § 522(p)(1)*

The Waszkiewiczes originally objected to Enloe's claimed homestead exemption pursuant 11 U.S.C. § 522(p)(1).  Enacted as part of BAPCPA, § 522(p)(1) prevents a debtor from exempting certain interests from the bankruptcy estate if they were acquired during the statutory time period and their aggregate value exceeds a certain threshold.  *Wallace v. Rogers (In re Rogers)*, 513 F.3d 212, 217 (5th Cir. 2008).  The statute reads, in pertinent part:

> [A]s a result of electing under subsection (b)(3)(A) to exempt property under State or local law, a debtor may not exempt any amount of interest that was acquired by the debtor during the 1215-day period preceding the date of the filing of the petition that exceeds in the aggregate $155,675 in value . . . [in] real or personal property that the debtor or dependent of the debtor claims as a homestead.

11 U.S.C. § 522(p)(1).  Any amount of such interest does not include any interest transferred from a debtor's previous principal residence located within the same state.  *Id.* § 522(p)(2)(B).

Enloe filed for bankruptcy on November 14, 2014.  (ECF No. 1).  He purchased the Griggs Road property on July 27, 2012, well within the 1215-day statutory period.  However, Enloe amended his schedules in light of § 522(p) to limit his homestead exemption to $155,600.00.  (ECF No. 82 at 7).  Accordingly, the Court will turn to the Waszkiewiczes' second objection.

*11 U.S.C. § 522(o)*

The Waszkiewiczes further object to Enloe's homestead objection pursuant to 11 U.S.C. § 522(o).  Section 522(o) is another BAPCPA provision which reduces:

the value of an interest in . . . real or personal property that the debtor or dependent of the debtor claims as a homestead . . . to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

In other words, the amount of a state homestead exemption is reduced to the extent that the value of the exemption is attributable to nonexempt property that the debtor converted into the homestead within 10 years of filing for bankruptcy, if the conversion was made with the intent to hinder, delay, or defraud creditors. *Addison v. Seaver (In re Addison)*, 540 F.3d 805, 810 (8th Cir. 2008).

Enloe admitted to "disposing of" $70,000.00 from the Raymond James annuity when he initially purchased the Griggs Road property in July of 2012. (ECF No. 65 at 20). Bank records show that Enloe transferred an additional $125,000.00 from the Raymond James annuity to Usonian, LLC, which was used to construct improvements at Griggs Road. (Movants' Ex. No. 18; ECF No. 80 at 39). Although Enloe testified that he expended "almost all" of a $110,000.00 distribution from the Raymond James IRA on the Griggs Road construction in 2013, because the IRA could have been claimed as exempt under 11 U.S.C § 522(b) at the time of the transfer, that was not a transfer of non-exempt assets into exempt assets as defined by § 522(o).[4] (ECF No. 65

---

[4] 11 U.S.C. § 522(o) only pertains to the debtor's interest in property which "the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of." Under § 522(b), a debtor may choose between the federal exemptions set forth in § 522(d), or the exemptions provided by the state. Enloe elected the Texas exemptions. The Court previously ruled that the inherited IRA was properly claimed as exempt pursuant to Texas law at the May 14, 2015, hearing.

Section 42.0021(a) of the Texas Property Code states that "a person's right to the assets held in or to receive payments, whether vested or not, under any . . . individual retirement account or individual retirement annuity, *including an inherited individual retirement account . . .* is exempt from attachment, execution, and seizure for the satisfaction of debts to the extent the plan, contract, annuity, or account is exempt from federal income tax, or to the extent federal income tax on the person's interest is deferred until actual payment of benefits. . . ." There is no dispute that the IRA in question was an "inherited individual retirement account" as defined by 26 U.S.C. § 408(d)(3)(C). As an inherited IRA, it was exempt from taxation pursuant to 26 U.S.C. § 408(e) at the time of the transfer. Accordingly, the inherited IRA fell within the language of Tex. Prop. Code § 42.0021(a).

at 42).   Accordingly, the Waszkiewiczes have established by a preponderance of the evidence that Enloe transferred $195,000.00 of non-exempt assets into his homestead within ten years of filing for bankruptcy.

The question, then, becomes whether Enloe transferred non-exempt assets into his homestead with "the intent to hinder, delay, or defraud a creditor."   This phrase is not defined in § 522(o), but is used elsewhere in the Bankruptcy Code.   For example, § 548(a) provides that the trustee may avoid transfers made within two years of the petition date if the debtor made the transfer "with actual intent to hinder, delay, or defraud" creditors.   The phrase is also used in § 727(a)(2) with regards to denying a debtor's discharge.   "Given these similarities in language, courts have looked to decisions interpreting §§ 548(a)(1) and 727(a)(2) when interpreting § 522(o)."   *In re Cipolla*, 476 Fed. Appx. 301, 306 (5th Cir. 2012).

Evidence of actual intent is required to support a finding sufficient to deny a discharge, or in this case, to deny a homestead exemption.   *Id.* (citing *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003)).   Constructive intent is insufficient.   Nevertheless, because direct evidence of actual intent is rarely available, actual intent may be inferred from circumstantial evidence.   *Dennis*, 330 F.3d at 701.   To that end, courts may look to certain "badges of fraud" to assist them in discerning fraudulent intent.   The Fifth Circuit has identified several of these badges in the context of a § 727(a) action:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Id.* at 702.

In addition, courts evaluating intent to defraud under § 522(o) have also looked to the badges of fraud under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). *Cipolla*, 476 Fed. Appx. at 307. Relevant factors include:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* at 307-08.

Several of these factors are immediately apparent. The transfer was to an insider, namely, himself. Enloe retained possession and control of the property after the transfer, and in fact made it his primary residence. The Waszkiewiczes had sued him in 2010, only two years before the transfer was originally made. In addition, on December 22, 2010, he had been ordered by the Harris County District Court to pay Bruce Steffler, his ex-wife's attorney, $10,000.00 in

fees in regards to a suit to modify the parent-child relationship.  (Movants' Ex. No. 34 at 19).  He

had also been sued by a woman named Mary Wilson in October of 2012.  (ECF No. 80 at 47).

      Evidence also exists that Enloe concealed assets.  On May 31, 2013, he signed and

swore to an inventory and appraisement of his father's estate, in his capacity as estate executor.

(Movants' Ex. No. 14).  In the category marked, "Cash Belonging to the Estate," Enloe wrote

zero.  No mention was made of either the Raymond James IRA or Raymond James annuity.

When asked to explain the omission, Enloe stated that he was not lucid at the time at that it

"never occurred to me" that anyone who looked at the appraisal would not realize the estate in

fact had substantial cash holdings.  (ECF No. 80 at 49).

      Enloe was also insolvent at the time of the transfers.  "A debtor who is generally not

paying the debtor's debts as they come due is presumed to be insolvent."  Tex. Bus. & Com.

Code § 24.003(b).  As of July 2012, Enloe had not paid either the Waszkiewiczes or Steffler on

their debts dating back to 2010.  Enloe also agreed that he was continuously late in making child

support payments to his ex-wife.  (ECF No. 80 at 26).  In fact, it appears that he was late on a

total of thirty child support payments from June of 2010 through March of 2014, often by over

three weeks.   (Movants' Ex. No. 35 at 5-7).   Enloe has offered no evidence to rebut his

insolvency.

      Finally, an examination of the "general chronology" of events provides circumstantial

evidence of intent.  Enloe incurred significant debts in 2010, both to the Waszkiewiczes and his

ex-wife's attorney.  Although the alleged fraudulent transfers of assets did not begin until July of

2012—a two-year gap is not a "short" period of time[5]—it is important to note that Enloe did not

acquire the non-exempt assets until after his father's death in February of 2012.  Enloe testified

---

[5] *See, e.g.*, *In re SMTC Mfg. of Tex.*, 421 B.R. 251, 309 (Bankr. W.D. Tex. 2009) (finding that a one-year gap between the debt incurring and the transfer was not short).

that he received $116,000.00 in cash from the Raymond James annuity several weeks later March of 2012.  (ECF No. 65 at 16).   Only four months after he received the money he purchased the Griggs Road property with entirely non-exempt assets.  He then transferred an additional $125,000.00 to Usonian in late 2012, which he admitted was used to construct improvements to the property.

Enloe moved into the house in late 2013.  (ECF No. 80 at 7).  In September of 2014, the Waszkiewiczes attempted to serve a subpoena on Enloe in connection with their state court judgment.  A process server executed an affidavit stating that he attempted to serve the subpoena on Enloe six times in September at the 3506 Griggs Road address.  (Movants' Ex. No. 29).  He further stated that people were present in the house during several of his attempts but they would not come to the door.  *Id.*  Two cars, one registered to Kim Enloe and one to his father Jim Enloe, were in the driveway during the process server's visits.  *Id.*  Enloe has testified that, due to his drinking, he cannot remember ever receiving a copy of the subpoena or any other documents sent to him via certified mail in connection with the state court judgment.  (ECF No. 80 at 16-17).  However, this testimony is somewhat contradicted by the process server's affidavit which raises the possibility that Enloe was actively avoiding service.  The Waszkiewiczes also attempted to serve via certified mail an Application for Turnover After Judgment on Enloe at the Griggs Road property on November 22, 2014.  (Movants' Ex. No. 30 at 2).  Although Enloe testified that he was familiar with the concept of certified mail generally, he had no recollection of receiving the communication.  (ECF No. 80 at 16-17).

In sum, Enloe began a transfer of non-exempt assets into an exempt homestead almost immediately after he inherited a large sum of money and while he was aware of extensive pre-existing debts.  The evidence demonstrates that Enloe generally was not paying debts as they

came due at the time of the transfers and further that he attempted to conceal assets. Finally, it appears that Enloe may have been consciously avoiding his creditors' attempts at service.

This case is unusual, however, in that not only have several badges of fraud been met, but Enloe himself has testified that he was attempting to hinder, delay, or defraud his creditors. At the first hearing, he candidly admitted that he built the house "to set my daughter up in life." (ECF No. 65 at 23). He then agreed that it was his intention to "protect [his] assets from creditors so that they would be preserved for [his] daughter." *Id.* at 25. At this point, he stated that he never would filed bankruptcy had he known the legal effect filing would have on his homestead exemption, and further, that it was his intent to "pay[] everybody off." *Id.* It is unclear from his testimony how he planned on paying everybody off, given that it was always his intent to utilize the homestead exemption to the maximum extent possible.

Enloe's attempt to retract this statement at the July 22 hearing was similarly unconvincing. He claimed that he did not remember his prior testimony and that while "it had always been my call to set her up in life but had no intent or idea it would happen with just one house." (ECF No. 80 at 30). He then admitted that constructing the home was "one piece of trying to set her up for life" but that he did not outline a full picture in his prior testimony due to his drinking. *Id.* at 30-31. Even as he attempted to walk back his prior testimony, Enloe acknowledged that protecting his assets for his daughter was one factor that played in a role in his decision to construct the house. Furthermore, although Enloe claimed his testimony at the prior hearing was erroneous due to his intoxication, it must be noted that his earlier testimony on this point was more candid and less muddled than his self-serving testimony at the later hearing. The following exchange is instructive:

> THE COURT: -- and if the transcript is accurate – and I can play it to see if the transcript is accurate – it says that you did 3506 [Griggs Road] to set your

daughter up for life.  Today you said you didn't do 3506 to set your daughter up
for life.  I'm trying to understand why there is that difference.
. . .
THE WITNESS: Well, you do one and then another.  So, it wasn't that it would
set her up in life, one house.  Sell, it wouldn't – see, it would – I mis – if I
misspoke – I don't remember the testimony exactly very well, and so, it had
always been my call to set her up in life but had no intent or idea it would happen
with just one house.
. . .
THE COURT:  So – and I don't want to put words in your mouth. . . .  But I want
to understand what you're saying.  Are you saying today, that the 3506 Griggs
home was one piece of trying to set her up for life?

THE WITNESS:  Yes, exactly sir. . . .  When you sell a home, you – if you're
holding it for the money, you know, they're there at the closing with you.  It was a
way to attempt to clean up as well.

THE COURT:  Let me see if I can bring this up so that you can hear it and I can
hear it.

THE WITNESS: I see what I said.  I – not to me that – I see it, but I can only
chalk it up to not outlining the full picture, because I may –

THE COURT: Chalk it up to not what?

THE WITNESS: Outlining the full picture of my thoughts there.  I was clearly not
myself, and –

THE COURT: Ok.

(ECF No. 80 at 31).  The Court finds Enloe's original testimony on this issue to be the more

credible.

"It is one thing to convert non-exempt assets into exempt property for the express

purpose of holding it as a homestead and thereby putting the property beyond the reach of

creditors.  However, it is quite another thing to acquire title to a house for no other reason than to

defraud creditors."  *In re Sholdan*, 217 F.3d 1006, 1011 (8th Cir. 2000).  Enloe admitted that he

wanted to protect his assets from his creditors.  He did not purchase the Griggs Road property

primarily to use it as a homestead, rather, he did it to shield his assets and ensure they would be

passed down to his daughter.  Enloe even went so far as to state he would not have filed bankruptcy if he had been aware of the law's effect on his homestead exemption.  Given his testimony, as well as the presence of several badges of fraud, the Court infers that Enloe acted with actual fraudulent intent.  While debtors may plan investments in exempt property to maximize their allowed exemptions, they may not do so with the intent to hinder, delay, or defraud creditors.  *See In re Van Erem*, 2015 WL 1293525 at *9 (Bankr. S.D. Tex. Mar. 18, 2015).

*Alcohol Impairment and Fraudulent Intent*

   a. Alcohol Impairment May Properly Be Considered a Factor When Assessing Fraudulent Intent

At the conclusion of the May 14, 2015, hearing, the Court asked the parties for briefing on the issue of how Enloe's apparent alcohol impairment potentially affected his ability to form a fraudulent intent.  After reviewing the briefing and relevant case law, the Court concludes that while alcohol impairment may refute an inference of intent under certain circumstances, the inquiry is fact intensive and the mere presence of alcohol abuse does not automatically negate intent.  Because Enloe claimed that his alcoholism caused severe memory loss, the Court reviewed cases relating both to drug and alcohol abuse and memory loss in general.

In *In re Hendrix*, the debtor faced denial of discharge for allegedly making false statements in her bankruptcy schedules.  352 B.R. 200, 202 (Bankr. W.D. Mo. 2006).  She had failed to disclose numerous property interests such as an expensive furniture set and her ownership stake in several business ventures.  *Id.* at 206.  In defense of these omissions, the debtor claimed that she was under a great deal of pressure and was taking medication for depression.  *Id.* at 208.  The court rejected her assertion that her emotional problems "were such that she was not capable of forming the requisite intent for denial of discharge."  *Id.*  However, in

that case the debtor provided no evidence, including expert testimony or medical records, to corroborate her story.

By contrast, in *In re Chadwick*, the court found the debtor's mental state such that she did not knowingly act with fraudulent intent in violation of 11 U.S.C. § 727(a)(4).  335 B.R. 694, 703 (W.D. Wis. 2005).  The debtor had suffered from a total of four strokes in the years leading up to her bankruptcy.  Her daughter testified that after the strokes she had difficulty focusing, multi-tasking, and remembering things.  *Id.* at 699.  The debtor testified that she had filled out her bankruptcy schedules to the best of her ability, but acknowledged she had failed to disclose certain assets on her bankruptcy schedules.  The Court held that because she did not know that her schedules were erroneous when she prepared them, the debtor could not have acted with the intent to hinder, delay, or defraud creditors.  *Id.* at 702-03.

One of the few cases addressing drug and alcohol abuse and its relation to intent is *In re Trieloff*, where the debtor testified that she had struggled with chemical dependency for much of her life.  2012 WL 3201786 (Bankr. D.N.D. Aug. 2, 2012).  She accepted voluntary treatment several times in 2009.  *Id.* at *1.  In 2011, she filed for chapter 7 bankruptcy and failed to disclose that she owned several patents on her Schedule B.  *Id.*  at *2.  She also falsely denied that she had made any pre-petition transfers to creditors within 90 days of filing for bankruptcy and greatly exaggerated her monthly rent payment.[6]  She offered no expert testimony or other evidence establishing her history with drug and alcohol abuse.  The court also noted her professional successes during the relevant time period, stating that her "ability to advance in various careers and to address exceptionally difficult personal challenges is more indicative of

---

[6] On her Schedule J she claimed that she paid $1200/mo. in rent.  However, she actually paid only $200.00 in monthly rent because she was able to reside in transitional housing after leaving alcohol treatment.

ability than disability." *Id.* at *7. Ultimately, the court cited *In re Hendrix* approvingly and determined that the debtor's chemical dependency could not excuse her false statements. *Id.*

Enloe relies primarily on *In re Fontenot* for the proposition that his alcohol abuse prevented him from acting with the requisite intent for fraud. In that case, the debtor performed various renovations to the plaintiffs' home. 89 B.R. 575, 578 (W.D. La. 1988). Although he performed the work satisfactorily, the debtor failed to pay a number of material suppliers who filed liens against the home. *Id.* The plaintiffs sued the debtor for non-dischargeability of a particular debt due to actual fraud under to 11 U.S.C. § 523(a)(2)(A). *Id.* Although there was no dispute that the debtor had failed to pay off the suppliers, the debtor testified that he had been taking lithium to treat his bi-polar disorder. The debtor also introduced the deposition of his psychiatrist who testified that the debtor had "impaired ability to make rational judgments and formulate workable plans to plan ahead to do something concrete." *Id.* at 579. The court found that because of his bi-polar disorder, the debtor was both mentally and physically impaired during the relevant time period. *Id.* It concluded that the debtor "lacked the intent necessary for false pretenses, false representation, or actual fraud under section 523(a)(2) of the Bankruptcy Code." *Id.* at 581. In reaching this conclusion, the court relied not only on the debtor's bipolar disorder, but also the fact that he always intended to pay his creditors and that he had never misrepresented the state of his financial affairs. *Id.* at 581-82.

      b. **Enloe Has Not Demonstrated that He Was So Impaired by Alcohol Abuse that He Could Not Act with Fraudulent Intent**

There appears to be little doubt that Enloe had a serious alcohol problem by 2014. He went to the hospital twice in 2014 and an additional three times in 2015 for alcohol treatment. (ECF No. 80 at 60-62). His last visit to the hospital in June of 2015 lasted for over a month. He has testified that the alcohol caused him to experience memory loss and a general decline in his

cognitive function.  *Id.* at 54.  This testimony is corroborated by the testimony of his two friends, both of whom stated that Enloe would forget prior conversations they had had as well as upcoming engagements.   *Id.* at 64, 72.   Both also recounted separate incidents—one in September of 2014 and the other in June of 2015—where they were shocked by Enloe's disheveled and confused state.  Enloe has not provided any expert testimony regarding his alcoholism, but as demonstrated in *In re Chadwick*, such testimony is not strictly necessary.  In that case, the court found the daughter's testimony regarding the debtor's memory loss following a series of strokes sufficient to negate any intent to hinder, delay, or defraud creditors.  335 B.R. 694, 702-03 (W.D. Wis. 2005).

However, the issue in this case is *not* whether Enloe was so incapacitated by his alcohol abuse that in 2014 that he could not have acted with fraudulent intent.  Section 522(o) relates to "property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor. . . ."  The operative date is not Enloe's state of mind as of the petition date, but rather his state of mind when he made the transfers. *See Cipolla v. Roberts (In re Cipolla)*, 476 Fed. Appx. 301, 306 (5th Cir. 2012).

The first such transfer occurred on July 27, 2012, when Enloe used $70,000.00 in non-exempt assets to purchase the Griggs Road property.  Enloe then transferred an additional $125,000.00 in non-exempt assets into Usonian, LLC, in two installments, on September 20, 2012, and December 17, 2012, respectively.  (Movants' Ex. No. 18 at 4).  Almost all of this money was used to finance the construction of the house by the end of 2012.  (Movants' Ex. 19 at 3-5).  But Enloe has testified that his drinking only began due to his grief over his father's death in February of 2012.  (ECF No. 80 at 52).  According to Enloe, "I started out small, and I kept building over time to a fifth or more per day."  *Id.* at 53.  Enloe has not provided any

evidence of his mental state in 2012 specifically, other than that he began drinking in small amounts after the death of his father.

In addition, Enloe's assertion that his mental state was so impaired he could not act with fraudulent intent is belied by his actions during the relevant time period.  He was able to serve as the executor of his father's estate and oversaw the sale of his father's townhome.  He then purchased land with his inheritance and formed an LLC—apparently filing all the necessary paperwork with the Secretary of State—to build his house.  Enloe managed to purchase the materials necessary to build the house and hire the requisite subcontractors, no easy task as evidenced by the 120 checks drawn on Usonian's account in 2012.  Even as his alcohol problems worsened in 2013 and 2014, Enloe managed to finish his house.  He claims that he did not do a particularly good job because of his drinking, but the fact remains that the house is substantially complete and undeniably habitable.  Questions of whether the siding was installed properly or whether the house was inferior to Enloe's previous work are of no import.  Enloe's ability to purchase and construct the house indicates that he had the necessary mental capacity to shield his assets from creditors.

*The Proper Reduction in Enloe's Homestead Exemption*

Having established that Enloe transferred $195,000.00 of non-exempt assets into his exempt homestead with the intent to hinder, delay, or defraud creditors, the Court must determine the necessary reduction in his exemption.  Under the terms of the statute, Enloe's homestead exemption must be reduced "to the extent that such value *is attributable to any portion* of the property. . ." obtained with non-exempt assets.  Because Enloe utilized both exempt and non-exempt assets in the construction of his home, the entire value of the home is not attributable to the non-exempt assets.  Enloe transferred $195,000.00 of non-exempt assets

from the annuity and $110,000.00 of exempt assets from the Raymond James IRA.  Accordingly, only 63.9% of the homestead's value is properly "attributable" to the non-exempt assets.

As of October 20, 2015, the Griggs Road property has not been sold.  (ECF No. 85).  By prior orders, the Chapter 7 Trustee is authorized to sell the property for any price above $165,000.00 and is required to accept any offer above $170,000.00.   Enloe's homestead exemption must be limited to 36.1% of the proceeds from the eventual sale of the home up to the $155,675.00 limit imposed by 11 U.S.C. § 522(p).  All other proceeds from the sale are non-exempt.

### Conclusion

The Court will issue an Order consistent with this Memorandum Opinion.

SIGNED **December 3, 2015.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE